**DIXIE–PORTLAND FLOUR MILLS, INC., a Tennessee Corporation, Plaintiff,**

v.

**NATION ENTERPRISES, INC., an Illinois Corporation, d/b/a Nation Pizza Products, Inc., Defendant.**

**NATION ENTERPRISES, INC., Counter-Plaintiff,**

v.

**DIXIE–PORTLAND FLOUR MILLS, INC., Counter-Defendant.**

No. 84 C 6124.

United States District Court, N.D. Illinois, E.D.

July 16, 1985.

Robert K. Blain, Altheimer & Gray, Catherine E. Long, Paul M. Hummel, Chicago, Ill., for plaintiff.

1. Dixie-Portland is incorporated and does business in Tennessee. Nation is an Illinois corporation, doing business in Chicago. Jurisdiction is therefore proper under 28 U.S.C. § 1332.

2. The parties assume that Illinois law governs this suit. This is correct. Sitting in diversity, we must apply Illinois' choice of law rules. *See Klaxon Co. v. Stentnor Electric Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Illinois courts apply the "most significant relationship test" to actions sounding in tort. *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593 (1970).

Barry E. Garley, Phillip M. Goldberg, Conklin & Adler, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Dixie-Portland Flour Mills, Inc. ("Dixie-Portland") filed this diversity suit[1] against National Enterprises, Inc. ("Nation") alleging breach of a sales contract. The basic facts are undisputed: Dixie-Portland contracted to sell flour to Nation for the latter to use in its production of pizza crusts. Dixie-Portland claims that Nation failed to pay for the flour, breaching the contract. Nation counterclaims, alleging that the flour it bought was contaminated with sand. It seeks damages for lost profits, loss of business and costs of replacement of the flour and other ingredients mixed with it. It alleges tort theories of negligence and negligent misrepresentation, strict liability, fraud and willful and wanton conduct (Counts I, II, VII and VIII, respectively). It also alleges several contract theories, including breach of express warranty, implied warranty of merchantability, implied warranty of fitness for particular purpose and breach of contract (Counts III–VI, respectively). Dixie-Portland filed an answer to the four contract counterclaims but has moved to dismiss the tort counterclaims. For the reasons stated below, the motion is granted.

### A.

Dixie-Portland's main attack is that Nation's negligence and strict liability counterclaims seek only "economic damages," and that Illinois law[2] requires that such

Four factors govern the choice of law: (1) the place of injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, place of incorporation and place of business of the parties; and (4) the center of gravity of the parties. *See, e.g., D.P. Service, Inc. v. A.M. International,* 508 F.Supp. 162, 165 (N.D.Ill.1981). The place of injury is Illinois. The place of conduct which caused the injury was probably Tennessee. The other two factors appear evenly balanced. Under the most significant relationship test, the place of injury presumptively con-

damages be recovered in contract, not tort. The parties agree with this general statement of the law but disagree as to whether Nation seeks only "economic damages."

The seminal Illinois case is *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). The Supreme Court there held that a plaintiff may not recover solely economic losses under tort theories of negligence or strict liability. The court defined "economic losses" as

> damage for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property as well as the diminution on the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.

91 Ill.2d at 82, 61 Ill.Dec. at 752, 435 N.E.2d at 449 (citations and internal quotations omitted). The court reasoned that such losses are essentially losses of contractual expectation interests, which are comprehensively regulated through the Uniform Commercial Code's (UCC) network of warranties; the Court felt that UCC "provides the proper standard when a qualitative defect is involved, i.e., when a product is unfit for its intended use." *Id.* at 81, 61 Ill.Dec. at 751, 435 N.E.2d at 448. However, when the product is unreasonably dangerous to the consumer or to his or her property, strict liability (or negligence liability, if relevant) applies to his or her personal or property injuries. "This comports with the notion that the essence of a product liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property." *Id.*

Nation argues that the defective product did damage some of its property so that it may recover in tort under *Moorman*. It contends that the sand not only rendered the product itself defective, but also contaminated other ingredients used in making the crust, as well as causing it to use up, and thereby "destroy," materials used to package the crusts. Dixie-Portland counters that Nation is really seeking only "economic" losses: the countercomplaint explicitly seeks only lost profits and damages for loss of reputation and future business.

We do not think much can be gained by focussing on the type of damages claimed. The facts of this case make clear that in the business context there is not always a bright line separating "economic losses" from "damages to property"; indeed, the two categories tend to overlap. The "damage" to Nation's other ingredients and to its packaging can plausibly be called damage to its "property." This was caused by a defective product. In this description, we are speaking the language of tort. *See also Abco Metals Corp. v. J.W. Imports Co., Inc.*, 560 F.Supp. 125, 129–30 (N.D.Ill.1982) (faulty wire-chopper caused plaintiff to waste wire, recovery in tort allowed), *aff'd on other grounds*, 721 F.2d 583 (7th Cir. 1983). Yet it can also be described reasonably as a diminution of its inventory, leading to loss of profits. The second description concerns diminished expectations and "economic" loss and thus speaks the language of contract. In sum, the demarcation between economic loss and property damage is not helpful in this case because it yields no clear answer.

■ Illinois courts, including *Moorman*, recognize that a court should not lavishly adhere to the economic loss/property damage distinction. Rather, the Court must look deeper to the policies underlying the *Moorman* rule:

> In drawing this distinction [between economic loss and physical damage], the items for which damages are sought, such as repair costs, are not determinative. Rather, the line between tort and contract must be drawn by analyzing

trols, unless another state has a more significant relationship to the suit. *Id.* Tennessee's contacts do not appear more significant than those of Illinois, so the law of Illinois—where the injury occurred—controls.

interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty is most applicable to a particular claim.

*Moorman,* 91 Ill.2d at 85, 61 Ill.Dec. at 753, 435 N.E.2d at 450, *quoting Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1172–73 (3d Cir.1981). Thus, if the "nature of the defect" is a "qualitative" one, such that at core it merely injures a purchaser's expectations, the UCC provides the remedies. *Id.* 91 Ill.2d at 85, 61 Ill.Dec. at 753, 435 N.E.2d at 450. But if the product's defect makes it hazardous or unreasonably dangerous, so that it causes a "sudden and dangerous occurrence" which in turn causes physical injury, tort provides the remedy.

■ A recent Illinois Appellate Court opinion also emphasizes that the type of damages sought is not controlling. *See Vaughn v. General Motors Corp.,* 118 Ill. App.3d 201, 73 Ill.Dec. 643, 454 N.E.2d 740 (1983), *aff'd,* 102 Ill.2d 431, 80 Ill.Dec. 743, 466 N.E.2d 195 (1984). In that case, only the product itself was harmed. A truck with defective brakes locked, damaging the vehicle, leading to loss of business profits. A crabbed reading of *Moorman* would have precluded recovery in tort because the *Moorman* court does mention that tort does not apply "where only the defective product is damaged." 91 Ill.2d at 85, 61 Ill.Dec. at 753, 435 N.E.2d at 450. But the *Vaughn* court correctly read *Moorman* as holding that the nature of the damages is not the sole factor to consider. 118 Ill. App.3d at 203, 73 Ill.Dec. at 645, 454 N.E.2d at 741. Rather, after a discussion similar to ours above, the *Vaughn* court concluded that "the element of *causation* is essential to the court's holding in *Moorman." Id.* The economic loss/physical injury distinction is important, but so is the *Moorman* court's distinction "between damages caused by a qualitative defect (i.e., by failing to perform up to purchas-

er's expectations) and those caused by a sudden and dangerous occurrence." *Id.* The former will usually be remedied in contract, the latter in tort.

The *Vaughn* opinion signals, we believe, a move toward Justice Simon's well-reasoned concurrence in *Moorman,* which criticized heavy reliance on the economic loss/physical injury distinction, favoring instead an analysis which relies on the policies underlying tort and contract. *See* 91 Ill.2d at 95–99, 61 Ill.Dec. at 758–60, 435 N.E.2d at 455–57 (Simon, J., specially concurring). Justice Simon described the problem as follows:

> The true significance of physical harm is that it usually represents an invasion of a right existing apart from any contract—a tort interest. No one is supposed to set your house on fire, and neither should a product. But there are other such interests. A product should not wreck your employees' morale or your customers' good will, either; if it goes berserk and does so, that is likely to fall on the tort side of the line. On the other hand, if a product simply fails to live up to its promise, if it does not accomplish what it was supposed to the way it was supposed to, that is only an invasion of a contract–like interest: the user has lost the benefit of his bargain. If a refrigerator fails, the food inside may spoil, but there is no tort. The product may be inadequate or useless, but is not dangerous. The only risk is to commercial expectations.

*Id.* at 96, 61 Ill.Dec. at 758, 435 N.E.2d at 455. The Supreme Court's affirmance of the Appellate Court's opinion in *Vaughn* supports our conclusion that the physical injury/economic loss distinction is not necessarily controlling and might as well indicate a shift toward, though not yet a full embrace of, Justice Simon's analysis.

■ We think that the *Moorman* doctrine, as refined in *Vaughn,* places this case in the realm of contract. Whether Nation's losses be called physical, economic

or both,[3] the nature of the product's defect and the type of causation which occurred render this case "contractual." The sand in the flour, like defects in other *Moorman* cases,[4] made the product unfit for its intended use, reduced the value of the product and essentially did no more than deprive Nation of the benefit of its bargain. At the core, Nation's commercial expectations were unfulfilled. Moreover, the cause of Nation's harm was not sudden or dangerous.[5] The flour was simply bad, and Nation's ignorance of this qualitative defect led it to mix with other ingredients and waste materials in packaging the sandy dough. This type of causation falls more within the contract realm of diminished expectations than within the accident world of torts. Finally, this is a situation of manufacturers dealing at arms' length. The *Moorman* court preferred the UCC as the vehicle for resolving disputes simply involving diminished commercial expectations, and this preference gains particular force where the contracting parties are businesses dealing at arms' length, rather than a manufacturer and an ultimate individual consumer. In sum, given the commercial setting, the nature of the defect, the type of risk and the manner in which the injury arose, Dixie-Portland's motion to dismiss the tort counterclaims in Counts I, II and VII[6] is granted.

## B.

■ Nation also alleges intentional misrepresentation in Count VII and negligent misrepresentation as part of Count I. Before reaching Dixie-Portland's challenge to these counterclaims, we observe that *Moorman* does not bar recovery for solely economic losses from these tort claims. The court reaffirmed that economic loss may be recovered from one who intentionally makes false representation, *see Soules v. General Motors Corp.*, 79 Ill.2d 282, 37 Ill.Dec. 597, 402 N.E.2d 599 (1980), and from one who negligently makes false representations and who is in the business of supplying information for the guidance of others in their business transactions, *see Rozny v. Marzul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969). *Moorman*, 91 Ill.2d at 88–89, 61 Ill.Dec. at 754–55, 435 N.E.2d at 451–52. Thus, the *Moorman* doctrine does not bar recovery of economic losses under either of these two causes of action.

However, Nation's two misrepresentation counts do not state grounds for relief. The alleged facts supporting these counterclaims are as follows: One of Nation's customers told it that the crusts were contam-

3. As noted earlier, the loss of inventory can be called either a property loss or an economic one. Most of the other alleged losses—of profit, of business—are economic. If it was only dollar value that counted, surely the "economic" losses would far outweigh the losses which could be labelled "property losses."

4. A substantial body of law under *Moorman* has developed already. The type of defect here is a "qualitative" one, more akin to those in cases which limited the plaintiff to recovery in contract. *See Chicago Heights Venture v. Dynamit Nobel of America, Inc.*, 575 F.Supp. 214, 218 (N.D.Ill.1983) (Aspen, J.) (deterioration of roof); *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982) (defective chimney wall and patio); *Moorman, supra* (crack in grain storage tank); *Palatine National Bank v. Charles W. Greengard Associates, Inc.*, 119 Ill.App.3d 376, 379–80, 74 Ill.Dec. 914, 917, 456 N.E.2d 635, 638 (1983) (defective storm water removal system); *Unarco Industries, Inc. v. Frederick Mfg. Co.*, 109 Ill.App.3d 189, 194, 64 Ill.Dec. 808, 810–11, 440 N.E.2d 360, 362–63

(1982) (faulty part installed in radio towers); *but see Abco Metals Corp. v. J.W. Imports Co., Inc.*, 560 F.Supp. 125, 129–30 (N.D.Ill.1982) (Decker, J.) (faulty wire chopper damages plaintiff's wire; recovery in tort allowed), *aff'd on other grounds*, 721 F.2d 583 (7th Cir.1983).

5. While courts have attributed great weight to this "sudden and dangerous occurrence" factor, we do think this factor, like other factors in *Moorman*, is not necessarily controlling. Some tort-like injuries do happen more slowly. Not every tort results from a cataclysmic event. However, this case does not involve such an exceptional situation.

6. Count VIII, which states a claim for "willful and wanton" conduct essentially echoes the strict liability and negligence counts, as well as the misrepresentation counts. To the extent it restates the former counts under a different tort theory, *Moorman* disposes of that count as well. To the extent it recasts a misrepresentation claim, it is subsumed in the discussion below and must be dismissed. It is so ordered.

inated. Nation hired a firm to test the flour and sent a sample to Dixie-Portland for it to test. After running its own test, Dixie-Portland told Nation that the flour was pure. Nation relied upon these false representations, continued to make its crusts and suffered further losses. Nation alleges alternatively that these representations were made negligently or intentionally.

 Nation's counterclaim for negligent misrepresentation cannot survive under Illinois law. To be liable for negligent misrepresentation, a defendant must be in the business of supplying information for the guidance of others in their business transactions. *See, e.g., Black, Johnson & Simmons v. IBM Corp.*, 109 Ill.App.3d 132, 135–36, 64 Ill.Dec. 730, 732, 440 N.E.2d 282, 284 (1982). Nation has not alleged that Dixie-Portland was in such a business. Thus, its counterclaim for negligent misrepresentation must fail.

 Its fraud counterclaim must be dismissed as well, though for a different reason. In Illinois the elements of a cause of action for fraud are: (1) false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) justifiable reliance or the right to rely; and (6) damage to the other party resulting from such reliance. *See, e.g., Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980).

 Nation's counterclaim fails on the fifth element—justifiable reliance. While Nation alleges that it relied on Dixie-Portland's representation that the flour was pure, it also admits in its brief that a customer had told it that the flour was not, and that it had hired an independent laboratory to conduct a test, which reported that sand was in the flour. Thus, it appears either that Nation did not in fact rely

on Dixie-Portland's representations, or that if it did, it did so unreasonably. In either case it cannot prevail. "Where it appears that a person charging misrepresentation has actually investigated and received information from his own sources rebutting the misrepresntation, as here, he is not in a position to claim he was deceived." *Peterson Industries, Inc. v. Lake View Trust & Savings Bank*, 584 F.2d 166, 168 (7th Cir. 1978) (internal citations and quotations omitted) (applying Illinois law). Nation says it conducted its own investigation. If it relied on its own investigators, as it says it did, it did not rely on Dixie-Portland and cannot prevail. But even if it did rely on Dixie-Portland, as it also says it did, it did so unreasonably because it had access to its own sources rebutting the misrepresentations. Accordingly, the fraud counterclaim, Count VII, is dismissed.

In light of the preceding discussion, we need not address Dixie-Portland's remaining arguments. Counts I, II, VII and VIII are dismissed, leaving only the contract counterclaims. It is so ordered.